```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION


Felicia A. Smith,              :

       Plaintiff,              :

     v.                        :    Case No. 2:13-cv-0620

Commissioner of Social         :    JUDGE MICHAEL H. WATSON
   Security,                        Magistrate Judge Kemp
                               :
       Defendant.
```

REPORT AND RECOMMENDATION

I.  Introduction

Plaintiff, Felicia A. Smith, filed this action seeking review of a decision of the Commissioner of Social Security denying her application for disability insurance benefits.  That application was filed on September 9, 2010 and alleged that Plaintiff became disabled on May 13, 2010.

After initial administrative denials of her application, Plaintiff was given a hearing before an Administrative Law Judge on January 10, 2012.  In a decision dated February 2, 2012, the ALJ denied benefits.  That became the Commissioner's final decision on May 7, 2013, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on September 9, 2013.  Plaintiff filed her statement of specific errors on October 8, 2013.  The Commissioner filed a response on January 13, 2014.  Plaintiff filed a reply brief on January 27, 2014, and the case is now ready to decide.

II.  Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 39 years old at the time of the administrative hearing, had graduated from high school, and had some cosmetology training, testified as follows.  Her testimony

appears at pages 48-59 of the administrative record.

Plaintiff stopped working in 2010 due to back problems.  At the time of the hearing, she was taking pain medication for her back, medication for depression, and additional medications for gout and high blood pressure.  On an average day, even with medication, her pain level was about seven or eight out of ten.

Plaintiff said that she did not usually get out and that she was in severe pain at the hearing.  She was having trouble sleeping or finding a comfortable position, but lying down was the most comfortable.  She occasionally went grocery shopping with relatives, could fold laundry, and sometimes drove.  She assisted in the care of her two children but other than helping them with her homework, she could not do much else.  She spent most of her time in bed watching television, but helped with the dishes once a week.  She needed assistance showering.

Plaintiff testified that she could sit for about twenty minutes before having to change positions.  She would need to walk around for two minutes before sitting back down.  She could not bend over and could lift a gallon of milk occasionally.  Her doctors had discussed both surgery and epidural injections with her, but she had no insurance to pay for such treatments.  She believed she was unable to work due to the amount of pain she experienced, her inability to sit still, and discomfort being around people.

### III.  The Medical Records

The medical records in this case are found beginning on page 160 of the administrative record.  The pertinent records can be summarized as follows.

Plaintiff was seen at the Ohio State University Medical Center Emergency Room on May 13, 2010, reporting constant back pain to the point of tears.  The pain was radiating to her legs and was not helped by rest, ice or heat.  Her back, buttocks and

calves were tender and she had a limited range of spinal motion, but straight leg raising was negative.  An MRI showed a number of disc protrusions and some foraminal narrowing at L4-5.  Degenerative changes were also present.  Plaintiff was discharged with a diagnosis of lumbar degenerative disc disease and was to follow up with her prior back surgeon.  She was also given medication.  (Tr. 160-76).

    Shortly afterward, Plaintiff went to the OSU Comprehensive Spine Center for an initial evaluation.  Her chief complaint was a one-month history of increased back pain with radiation into both legs, but more significantly on the right.  For the most part, she described her activity level as very limited.  She was noted to suffer from depression and insomnia.  She walked with an antalgic gait and had decreased lumbar range of motion and seated straight leg raising was positive on the right.  The examiner, Dr. Pulver, added to Plaintiff's medication and ordered a series of epidural steroid injections.  At several follow-up visits, it was determined that she was not a good candidate for further surgery, and she was told to stay as active as possible but to avoid significant lifting, bending or twisting.  She also said she could not afford the steroid injections.  Her pain had not improved by the time of the last visit on June 25, 2010.  (Tr. 177-97).

    Plaintiff had been treated by Dr. Peponis prior to that time, and his notes show that she reported the same increase in back pain to him on April 20, 2010.  She was still in pain in October, 2010, and had not obtained any relief.  In November, she reported her back was still painful but stable; in December, after making a trip to Atlanta, Plaintiff reported an increase in pain, and she described her pain as "unremitting & aggravated by weight bearing."  In April, 2011, she said she was sleeping poorly due to her inability to find a comfortable position, and

she demonstrated tenderness to palpation as well as muscle spasms and diminished deep tendon reflexes on the left side. (Tr. 198-208). Later notes described her pain as "intractable" and "constant." (Tr. 225-26).

Dr. Peponis filled out a medical source statement on August 18, 2011, indicating that Plaintiff suffered from degenerative disc disease and degenerative joint disease of the lumbar spine with radiculitis on the left side, and that her condition was aggravated by weight bearing, standing, stooping, bending, and lifting. He thought her pain would frequently interfere with her ability to concentrate and that she had a marked inability to deal with work stress. She could only sit for fifteen minutes at a time and would then need to walk about for fifteen minutes, but still could sit for only four hours in a work day and would need to lie down or sit down after fifteen minutes of walking. She could only stand or walk for two hours in a workday and could only reach or handle occasionally. Due to having "good days" and "bad days," she would miss more than three days of work per month. He said her condition had been like that for two years. (Tr. 215-23).

Dr. Margaret Smith, a psychologist, performed a consultative psychological evaluation on April 13, 2011. Plaintiff reported being depressed and withdrawn due to her back injury and pain. However, she had never been treated for psychological problems. Her daily activities were limited; she spent most of her time in bed, and was unable to attend her children's school activities. She could not sit through church, bend, or lift, and needed assistance doing housework. She was depressed and tearful during the evaluation, and reported fatigue and diminished appetite as well as some problems with memory and concentration. Dr. Smith viewed Plaintiff's self-reporting as reliable. Dr. Smith diagnosed major depression, recurrent, severe, and rated

-4-

Plaintiff's GAF at 50.  She thought Plaintiff could follow work instructions consistent with average intellectual functioning, but that there were "concerns ... with persistence and pace." Finally, Dr. Smith saw only minimal limitations in Plaintiff's ability to deal with supervisors or coworkers, but thought that due to Plaintiff's depression "there may be difficulty responding to work stressors at this time."  (Tr. 209-14).

The only other medical records are some additional notes from Dr. Peponis.  They do not show any significant change in Plaintiff's condition.  (Tr. 229-230).  However, some evaluations by state agency reviewers are in the file, and appear in the section of the records entitled "Payment Documents and Decisions."

The first is an initial evaluation done by Dr. Brock on December 8, 2010.  His conclusion was that Plaintiff could do a reduced range of light work and that this was consistent with the performance of her past work.  (Tr. 67-73).  Next, Dr. Hoffman and Dr. Cho provided an evaluation on Plaintiff's reconsideration request.  They found that Plaintiff had a severe spine disorder and a severe affective disorder; Dr. Hoffman, a psychologist, said that the latter caused only moderate impairments in the area of social functioning, and any other limitations were either mild or not present.  However, that form also attributed "great weight" to Dr. Smith's assessment, and Dr. Hoffman found a number of moderate limitations when she considered specific work-related functions, such as problems with stress tolerance, dealing with fast-paced work or production quotas, and the ability to respond to changes in the work setting.  Dr. Cho, who reviewed the evidence concerning Plaintiff's physical condition, concluded that she could do light work, and, like Dr. Brock, he thought she could return to her past work.  (Tr. 75-86).  Both Dr. Brock's and Dr. Cho's evaluations preceded the residual functional

capacity assessment done by Dr. Peponis in August, 2011.

## IV. The Vocational Testimony

A vocational expert, Mr. Kulman, also testified at the administrative hearing. His testimony begins at page 40 of the record, and additional testimony begins at page 59.

Mr. Kulman identified Plaintiff's past work as including home health aide, a semiskilled, medium job; warehouse sorter, an unskilled, medium job; library assistant, a skilled, light job; teachers aide, a semiskilled, light job; and cashier, an unskilled, light job. Some of the skills needed for the library assistant job were transferable to sedentary positions such as medical fee clerk, address change clerk, and auto title clerk.

After Plaintiff gave her testimony, Mr. Kulman was asked some questions about a hypothetical person who could lift and carry ten pounds occasionally, could do no frequent lifting and carrying, could stand and walk for two hours in a workday and sit for six, could push and pull consistent with the lifting restrictions, could frequently kneel, could occasionally climb ramps and stairs, balance, stoop, crouch and crawl, and could not climb ladders, ropes or scaffolds. Also, the person could not be exposed to harmful vibration, unprotected heights, or hazardous machinery, and could not do repetitive bending or twisting. Finally, that person could perform both simple, routine, repetitive tasks and moderately complex tasks, but could not perform work with strict time or production demands and could only deal with relatively static work processes and procedures. According to Mr. Kulman, someone with those restrictions could not perform Plaintiff's past relevant work but could do the three jobs he had previously identified.

Finally, Mr. Kulman was asked about a person who had not only those restrictions, but who also needed to change positions and who could not maintain any work posture for more than fifteen

minutes at a time.  The person also would miss more than three days of work per month and could not respond appropriately to changes in work situations or settings.  Also, the person could interact with others only occasionally.  Mr. Kulman replied that such a person was not employable.

    V.   <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision appears at pages 9 through 25 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured requirements for disability benefits through September 30, 2013.  Next, Plaintiff had not engaged in substantial gainful activity from May 13, 2010 forward.  As far as Plaintiff's impairments are concerned, the ALJ found that Plaintiff had severe impairments including lumbar degenerative disc disease with disc herniation in radiculopathy, with a history of prior lumbar microdiscectomy procedure, obesity, gouty arthritis, hypertension, and severe recurrent major depressive disorder.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work with these restrictions: she could not lift more than ten pounds and could do so only occasionally, she could stand or walk for two hours in a workday, could sit for six hours, could push and pull consistent with her lifting limitation, could kneel frequently, could occasionally balance, stoop, crouch, crawl and climb ramps and stairs, could not climb ladders, ropes or scaffolds, could not work in environments with obvious vibration, hazardous machinery, or

unprotected heights, could not do work involving bending or twisting, and was limited to simple, routine, repetitive tasks and moderately complex tasks that are comprised of relatively static work processes and procedures, involving no strict time or production demands.  The ALJ found that, with these restrictions, Plaintiff could not perform her past relevant work, but she could perform jobs such as medical clerk, address change clerk, and auto title clerk, and that such jobs existed in significant numbers in the regional, State, and national economies.  Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

VI.  Plaintiff's Statement of Specific Errors

In her statement of specific errors, Plaintiff raises these issues: (1) the ALJ's decision should be reversed because the residual functional capacity development was not supported by substantial evidence; and (2) the ALJ inappropriately weighed and considered the mental functioning opinion evidence and failed to provide support for the mental residual functional capacity.  The Court analyzes these claims under the following standard.

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir.

1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. The Treating Source Opinion

In support of her first claim of error, Plaintiff makes two separate arguments. First, she asserts that the ALJ improperly discounted or disregarded the opinion of Dr. Peponis, the treating physician. Second, she contends that the ALJ did not resolve conflicts in the opinion evidence as it relates to her physical limitations.

It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. 20 C.F.R. §404.1527(d); see also Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981). However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion. Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990). The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living. Cutlip v. Secretary of

-9-

HHS, 25 F.3d 284 (6th Cir. 1994).  No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision. Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

    The Court's analysis of this question always begins with a detailed review of the ALJ's reasons for declining to afford controlling weight to a treating source's opinion.  Here is what the ALJ had to say on that issue.

    The ALJ acknowledged that Dr. Peponis "appears to be a treating source" and that his opinion is entitled to controlling weight if "well-supported by and not inconsistent with objective clinical and laboratory findings."  (Tr. 22).  However, the ALJ found "multiple reasons" not to afford controlling weight to Dr. Peponis' opinion, including:

    (1) "the doctor does not provide sufficient clinical and laboratory data to support his conclusions";

    (2) "[h]is opinions are internally inconsistent";

    (3) "[he]... stated that the claimant would be absent from work more than three times a month, although he did not provide any reasoning or evidence"; and

    (4) the opinion "is inconsistent with the greater weight is (sic) medical evidence of record and with other credible opinion evidence."  Id.

    Plaintiff argues that none of these things are correct, and that the examples of inconsistency provided by the ALJ - what Dr. Peponis said about Plaintiff's need to alternate positions and either to sit down or lie down during a work day once she had been standing for a short while - are not inconsistencies at all.  The Commissioner concedes that the ALJ "misinterpreted" the

-10-

evidence on this point, see Memorandum in Opposition, Doc. 14, at 5 n.2, but otherwise argues that the ALJ acted properly in refusing to credit Dr. Peponis' views about Plaintiff's functional capabilities.

Taking these bases for disregarding Dr. Peponis' opinion in reverse order, the ALJ's assertion that his opinion is inconsistent with the greater weight of the medical evidence is plainly insufficient.  The statement does not identify exactly what medical evidence is inconsistent, and more weighty, than the evidence upon which Dr. Peponis relied.  This is directly contrary to the Court of Appeals' decision in Wilson, supra, where that court quoted and applied Social Security Ruling 96-2p's requirement that "a decision denying benefits '... must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" Wilson, 378 F.3d at 544.  See also Friend v. Comm'r of Social Security, 375 Fed. Appx. 543, 551-52 (6th Cir. Apr. 28, 2010)(finding an ALJ's articulation insufficient where the ALJ did not identify the other portions of the record which the ALJ claimed were inconsistent with the treating physician's opinion, did not discuss their inconsistency; as the court said, "it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").

The Commissioner's memorandum neither discusses the articulation requirement nor attempts to support the ALJ's efforts to explain the basis of his decision.  Although the Commissioner cites to various portions of the record which may be viewed as inconsistent with Dr. Peponis' opinion, the Court must rely on what the ALJ said and not on what he might have said.  "A court cannot excuse the denial of a mandatory procedural

-11-

protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion ...." Wilson, supra, at 546.

The ALJ also stated that one specific portion of Dr. Peponis' opinion - that Plaintiff would miss three or more days of work per month - was not accompanied by "any supporting reasoning or evidence." (Tr. 22). It is unclear what evidence Dr. Peponis might have cited in support of such a statement beyond all of the findings listed in the form he completed; if a patient is expected to suffer enough pain to make her unable to work at an eight-hour-a-day job consistently throughout a month and the pain stems from conditions which the physician has diagnosed (both of which are clearly the case here), the inability to cite to a specific objective finding concerning the number of days a patient might be off work for reasons relating to her physical condition cannot be considered fatal to such an opinion. What test exists for that? Dr. Peponis did indicate that Plaintiff had "good days" and "bad days," and the balance of the evidence supports that statement. Further, as the Court of Appeals observed in Sharp v. Barnhart, 152 Fed. Appx. 503, (6th Cir. Oct. 26, 2003), "[i]n the face of the extensive records and specific diagnoses introduced by [the claimant], the ALJ's generalized comment that the treating physicians' opinions [as to the number of days of work missed per month] were not 'based on a solid clinical and diagnostic foundation,' with no elaboration or detail, does not satisfy the procedural requirements for rejecting a treating physician's opinion laid out in §404.1527(d)(2)." That applies equally here.

Finally, the ALJ discounted Dr. Peponis' opinion because he did not provide enough objective data to support his conclusions. The only statement in the ALJ's opinion expanding on this conclusion is this: "He endorsed selections indicating that the claimant had reduced range of motion in the lumbar spine, sensory

-12-

changes, and positive straight leg raising test, although he provided no specific supporting objective findings." (Tr. 22). It is not entirely clear what this statement means.  Dr. Peponis' notes show that he examined Plaintiff on multiple occasions and observed some of the findings he recited, such as limited range of motion and sensory changes; other parts of the record contain objective confirmation, by MRI, of degenerative disc disease. Thus, to the extent that this rationale is founded on an absence of objective evidence in the record, it is simply wrong.

There may or may not be reasons on this record to discount some portions of Dr. Peponis' opinion, or to give portions of it less than controlling weight.  But those reasons were not adequately explained in the administrative decision.  A remand is needed to address these deficiencies.

      B. <u>The Mental Functioning Analysis</u>

In her second statement of error, Plaintiff claims that the ALJ erred in his evaluation of the evidence of her psychological impairment.  In particular, she argues that the ALJ created an illusory restriction in the area of understanding, remembering, and carrying out instructions which was unsupported by any medical evidence, and that the ALJ improperly rejected Dr. Peponis' mental functional capacity evaluation by finding that Plaintiff had no more than moderate limitations in her ability to react to changes in the workplace.

The first contention is easily disposed of.  Plaintiff is essentially complaining that the ALJ found her to be more restricted in her ability to deal with work instructions than the record would support.  If this was error - and it does not seem to be, since Dr. Smith described Plaintiff as being able to carry out instructions "consistent with average intellectual functioning," Tr. 213 - it is hard to see how it was prejudicial.

As to Dr. Peponis' evaluation, the ALJ rejected it in part due to Dr. Peponis' lack of specialization in the area of mental

impairments.  That is a valid reason to give such an opinion less weight, see, e.g., Payne v. Comm'r of Social Security, 402 Fed. Appx. 109, 121 n. 4 (6th Cir. Nov. 18, 2010), although, as noted by the Payne court, the fact that a primary care physician "is not a mental health specialist does not render him incapable of diagnosing and treating common mental illnesses such as major depressive disorder and anxiety."

   The other reasons given are more problematic, especially since Dr. Peponis' view of Plaintiff's ability to attend and concentrate was apparently based on her pain rather than on symptoms of depression or anxiety, and he was treating her directly for the conditions which caused her pain.  His notes are consistent with an impression of severe or intractable pain. The fact that, as the ALJ stated, "[n]o other physician has described her pain has indicated that [Plaintiff's] pain was intractable," Tr. 22, is not particularly probative since Dr. Peponis was the treating source and there are no other medical records which date from the same time frame as his opinion.  Further, the fact that Dr. Peponis also believed Plaintiff could function independently is not a true inconsistency in his opinion.  As the courts have said many times, "[a]n applicant need not be bedridden or completely helpless in order to fall within the definition of 'disability.'"  Walston v. Gardner, 381 F.2d 580, 585 (6th Cir. 1967); see also Ritterbeck v. Comm'r of Social Security, 2013 WL 796069, *3 (S.D. Ohio March 4, 2013)(taking a claimant's activities of daily living into account in assessing disability "is permissible so long as the fact that a claimant is not entirely bedridden is not equated with the ability to hold a full-time job").

   Finally, the ALJ's apparent decision to rely more heavily on the views of either Dr. Smith or Dr. Hoffman presents problems of its own.  In addition to the fact that neither was a treating source and neither appears to have made a separate evaluation of

the degree to which Plaintiff's pain interfered with her work abilities, Dr. Smith's evaluation - which Dr. Hoffman apparently relied on - is ambiguous on the issue of functional limitations. Dr. Smith did not use standard terminology in describing Plaintiff's limitations, saying, for example, that Plaintiff would have "difficulty responding to work stressors" without indicating the degree of difficulty (Tr. 214), and that there may be "concerns with persistence and pace" without specifying how serious those concerns might be.  Overall, the mental functional capacity assessment also suffers from significant deficiencies; a remand will give the Commissioner the opportunity to address these matters as well.

## VII.   Recommended Decision

Based on the above discussion, it is recommended that the plaintiff's statement of errors be sustained to the extent that this case be Commissioner of Social Security pursuant to 42 U.S.C. §405(g), sentence four.

## VIII.   Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a _de novo_ determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the

Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

<pre>
                                    /s/ Terence P. Kemp        
                                    United States Magistrate Judge
</pre>